IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | | |
|---|---|---|
| ALTOVESE WILLIAMS, individually, and as Administrator of the Estate of Marquis Jones, and as next Friend for Minors B.B.D, M.R.J., Jr., D.K.J., M.R.J., III, and M.R.H., | ) ) ) ) ) ) | Case No. 3:19-cv-00043-SMR-HCA |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT AND MOTION FOR SANCTIONS |
| CITY OF BURLINGTON, IOWA, and CHRIS CHIPREZ, | ) ) ) | |
| Defendants. | ) | |

Before the Court is Plaintiffs' Motion for Partial Summary Judgment, [ECF No. 90], Plaintiffs' Motion for Sanctions, [ECF No. 91], and Defendants' Motion for Summary Judgment, [ECF No. 92]. For reasons set forth in this Order, Plaintiffs' Motion for Partial Summary Judgment is GRANTED in part and DENIED in part. Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part. Plaintiffs' Motion for Sanctions is DENIED.

## I.  BACKGROUND

### A.  Factual Background[1]

The events underlying this lawsuit began shortly before 2:00 p.m. on October 1, 2017, when Burlington Police Officers Chris Chiprez and Joshua Riffel were on patrol in a marked police vehicle in Burlington, Iowa. As the officers approached a four-way stop sign at the intersection of South Central Avenue and Maple Street, the officers heard loud music coming from a red Pontiac G6 driven by Marquis Jones, who was traveling east on Maple Street. Prior to reaching the

---

[1] The facts described in this section are undisputed unless otherwise noted.

intersection, Jones turned the music down.  Jones then turned on to South Central Avenue traveling south.  The officers followed him.  Jones drove one block on South Central and then turned east on to Vine Street.  The officers followed Jones onto Vine Street but did not immediately initiate a traffic stop.  After following Jones for one more block, they initiated a traffic stop near the intersection of Vine Street and South 9th Street for a noise ordinance violation.  *See* Burlington City, Code § 58.10(1)(B) (2015).[2]  After stopping at a stop sign, Jones crossed South 9th Street and pulled over near the intersection of Vine Street and South 8th Street.

Immediately after pulling his car over, Jones exited the car and ran north on South 8th Street toward Maple Street.  Officer Chiprez gave chase on foot.  Officer Riffel stayed in the vehicle and drove east on Vine Street to South 7th Street and then north to Maple Street to intercept Jones as he fled.  Once he arrived at the intersection of Maple Street and South 7th Street, Officer Riffel observed Jones running east near the corner of Maple Street and South 7th Street.  Officer Riffel got out of the patrol vehicle, and ordered Jones to get on the ground.  Jones continued to run and Officer Riffel tackled him in the street.

---

[2]  The Burlington City Code provides, in part:

> 1. [N]o person shall so operate, play or permit the operation or playing of any radio, television, record player, tape deck or player, loudspeaker, amplifier, or sound truck, in such manner:
>
> . . .
>
> B. As to create a noise disturbance fifty (50) feet from the device, when operated in or on a motor vehicle on a public right-of-way or public space, or in a boat on public waters.

Burlington City, Code § 58.10(1)(B) (2015).

The parties dispute what happened next and, unhelpfully, the events were not captured on video due to the position of the patrol vehicle and because Officer Riffel had not activated his body camera.[3]  Defendants assert that, when Officer Riffel tackled Jones, he was holding a firearm. [ECF No. 92-1 at 3].  Plaintiffs dispute Jones was carrying the gun in his hand when he was tackled, arguing that he usually carried the gun tucked into the back of his compression shorts and it likely fell out of his shorts when he was tackled.  [ECF Nos. 112-1 ¶ 13; 112-3 at 37].  After the tackle, Jones resisted Officer Riffel's efforts to take him into custody.  [ECF No. 112-1 ¶ 14].  Officer Riffel testified in his deposition that Jones "pointed his gun at me" and "rose the gun towards my head . . . while we were on the ground."  [ECF No. 112-3 at 29].  In his interview with the Iowa Department of Criminal Investigations ("DCI") the day after the shooting, Officer Riffel told investigators that "[i]t looked like he was tipping [the gun] down towards me."  *Id.* at 49.  Officer Riffel stated he was afraid that he would not be able to gain control of the gun, so he shoved Jones off of him and ran in the other direction.  [ECF No. 94 at 15] (sealed).

As Officer Riffel was retreating, Officer Chiprez arrived at the scene on foot near the intersection of Maple Street and South 7th Street.  [ECF No. 112-1 ¶ 18].  Officer Chiprez did not observe the altercation between Jones and Officer Riffel.  *Id.*  Upon his arrival, Officer Riffel shouted "He's got a gun, Chip," to Officer Chiprez.  [ECF No. 94 at 27] (sealed).  Officer Chiprez testified that Officer Riffel appeared to be "spooked."  *Id.* at 26.  After he was released by Officer Riffel, Jones continued running east, over a retaining wall and up a hill between the houses.  Officer Chiprez testified that Jones "appear[ed] [to have] dropped [the gun] at some point on the roadway. He came back for that handgun, and then took off running."  *Id.* at 28.  It was at this point that

---

[3] Officer Riffel turned his body camera on immediately following the struggle with Jones. Officer Chiprez turned his body camera on early in his pursuit, before making contact with Jones.

Officer Chiprez drew his gun and shouted at Jones to drop his gun.  Within seconds of giving the order to drop the gun, Officer Chiprez fired seven shots at Jones, all of which missed.  *Id.* at 33.  Jones continued east, running up a slight hill and between the houses as Officer Chiprez fired the seven shots.  [ECF No. 112-1 ¶ 25].

As Jones was running away from Office Chiprez, he dropped several items, some of which are visible on the ground in the body camera footage.  Among the items Jones apparently dropped was his gun, which was later recovered from that location.  Body camera video from neither officer shows Jones dropping the gun.  *Id.* ¶ 39.  After shooting at Jones, Officer Chiprez ran to the top of the hill.  [ECF Nos. 92-2; 112-3 at 59].  Plaintiffs argue that Officer Chiprez saw the gun laying in the grass where it was later recovered.  Officer Chiprez denies he saw the gun.  [ECF No. 94 at 39] (sealed).

Instead of following Jones between the houses, Officer Chiprez and Officer Riffel ran north on South 7th Street toward Maple Street and then east on Maple Street.  [ECF No. 112-1 ¶ 26].  As Officer Chiprez approached an alley east of South 7th Street he observed Jones enter through a gate to fenced-in backyard.  *Id.* ¶ 29.  The parties' accounts of what happened then again diverge.  Officer Chiprez testified that he saw Jones "go to the ground" with his feet pointing "towards the alley."  [ECF No. 94 at 43] (sealed).  According to Officer Chiprez, after Jones went to the ground, he saw Jones raise up his upper body and move his arms into what he believed to be a "firing position."  *Id.*  Plaintiffs argue that, having dropped the gun, Jones was going to the ground to surrender.  Officer Chiprez then yelled "stop", before firing another round striking Jones in the chest.  [ECF No. 92-2 ¶ 17].

Officer Chiprez entered the backyard with his gun still drawn and found Jones lying on the ground with a single bullet wound to the chest. *Id.* at 2. Jones initially put his hands in the air but soon appeared to lose consciousness. The wound to the chest killed Jones.

Major Adam Schaefer arrived moments after the shooting. Once on the scene, Major Schaefer asked Officer Chiprez and Officer Riffel if Jones had a gun and both officers responded, "he did." [ECF No. 112-3 at 6]. Plaintiffs contend that the responses of both officers about the gun, speaking in past tense, is evidence that they knew that Jones had dropped the gun between the houses as he was ordered to do by Officer Chiprez. *Id.* ¶ 34. The three officers patted down Jones but did not locate a gun on him. Major Schaefer then asked where the gun was. [ECF No. 92-2 at 2]. Here, both parties strongly dispute what was communicated to Major Shaefer. Defendants argue that both officers said they did not know where the gun was and both gestured toward South 7th Street while recounting Officer Riffel's tackle. Plaintiffs argue that Officer Chiprez and Officer Riffel told Major Schaefer that the "gun was 'at another location' while pointing toward 7th St," indicating that was where they believe the gun to be. [ECF No. 112 at 30].

The gun, a Glock .45 caliber, was soon located in the backyard of a house on the corner of South 7th Street and Maple Street, approximately where Officer Chiprez ordered Jones to drop the gun. [ECF No. 94 at 48] (sealed). Recovered next to the gun was a black bag containing marijuana, Jones's hat, and a set of keys. *Id.* at 54.

The investigation into the incident was led by the DCI and the Iowa Attorney General's Office. Following the investigation, Special Assistant Attorney General Scott D. Brown conducted a review to determine if the shooting of Jones was legally justified. On October 12, 2017, Brown sent a letter to Des Moines County Attorney Amy Beavers informing her that Officer Chiprez was legally justified in using deadly force on Jones. *See* [ECF No. 92-2] ("Brown Letter"). Brown

opined that Officer Chiprez's actions were "objectively reasonable under the circumstances," reasoning that Jones posed "a direct and deadly threat" to "[Officer Chiprez], fellow officer Riffel and potential by-standers." *Id*. at 52. Brown wrote that "Chiprez had no reason to believe that Jones had divested himself of the firearm until he neutralized Jones and made a direct investigation concerning his possession of a firearm." *Id.* Brown continued: "[u]nder the circumstances given Jones's behavior, his refusal to comply with the commands of officers, his choice to draw a firearm while he was engaged with Riffel, his choice to continue to arm himself once disengaged with Riffel and his choice to flee left Officer Chiprez with . . . no other alternative than to shoot under the circumstances." *Id*.

The same day the Brown Letter was sent to the Des Moines County Attorney, the City of Burlington issued a news release announcing that the Iowa Attorney General's Office determination that the use of deadly force was legally justified. *See* News Release - Burlington Police Dept Officer Involved Shooting, City of Burlington, Iowa (Oct. 12, 2017 4:23 PM) https://burlingtoniowa.org/CivicAlerts.aspx?AID=231&ARC=322.

## B. Procedural History

Plaintiffs filed this lawsuit on May 30, 2019. [ECF No. 1]. An Amended Complaint was filed May 27, 2020. [ECF No. 57]. A Second Amended Complaint was filed on October 14, 2020. [ECF No. 85]. Plaintiffs assert seven causes of action against the City of Burlington ("City") and Officer Chiprez under the United States and Iowa Constitutions, specifically: excessive use of force (Count I); violation of substantive due process rights (Count II); arrest without probable cause (Count III); and improper seizure of property (Count IV). They also assert claims under Iowa law for: wrongful death (Count V); loss of consortium (Count VI); and violation of Iowa's open records laws (Count VII).

On October 23, 2020, both parties filed motions for summary judgment.  Plaintiffs moved

for partial summary judgment on Count IV and Count VII, improper seizure of property and Iowa

open records law violation.  [ECF No. 90].  Defendants moved for summary judgment on all claims

in Plaintiffs' Second Amended Complaint.  [ECF No. 92 ¶ 5].  Plaintiffs also filed a Motion for

Sanctions against the City of Burlington and Major Adam Schaeffer for providing false and

misleading testimony in a deposition.  [ECF No. 91].  The Court held oral argument on all the

motions on January 13, 2021.  [ECF No. 130].

## II.    DISCUSSION

### A.  Cross-Motions for Summary Judgment

Plaintiffs assert several claims under the United States Constitution and the Iowa

Constitution.  Federal constitutional violations by state and local government officials are

actionable under 42 U.S.C. § 1983.[4]  The Iowa Code does not have an analogous statute providing

for a cause of action for violations of the Iowa Constitution but the Iowa Supreme Court has long

held that violations of the search and seizure provision of article I, section 8 can give rise to a suit

for damages.  *Godfrey v. State*, 898 N.W.2d 844, 862–63 (Iowa 2017) (collecting cases

demonstrating "the thoroughly well settled principle that violation of article I, section 8 gives rise

to a cause of action").  Indeed, this Court has previously found article I, section 8 to be self-

executing.  *See Meyer v. Herndon*, 419 F. Supp. 3d 1109, 1126–31 (S.D. Iowa 2019) (Rose, J.)

---

[4]  42 U.S.C. § 1983, in part, provides:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of
> Columbia, subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action
> at law, suit in equity, or other proper proceeding for redress . . . .

(predicting the Iowa Supreme Court would recognize article I, section 8 to be self-executing).

Plaintiffs bring a claim under article I, section 9 of the Iowa Constitution as well, which the Iowa

Supreme Court has also held to be self-executing.  *See Godfrey*, 898 N.W.2d at 871.  The Court

will begin by analyzing Plaintiffs' constitutional claims (Counts I–IV) before addressing both

common law claims (Counts V and VI) and their statutory claim (Count VII).

### 1.  Summary Judgment Standard

Summary judgment is appropriate only if "the movant shows that there is no genuine issue

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a).  At summary judgment, the Court's duty is not "to weigh the evidence and determine the

truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty

Lobby, Inc*., 477 U.S. 242, 249 (1986).  "[A]t the summary judgment stage, the nonmoving party

is given the benefit of all reasonable inferences." *White v. McKinley*, 519 F.3d 806, 813

(8th Cir. 2008).  The Court's inquiry "must be undertaken in light of the specific context of the

case, not as a broad general proposition." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quotation

omitted).  However, "[C]ourts may not resolve genuine disputes of fact in favor of the party

seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).  "[C]ourts must take

care not to define a case's 'context' in a manner that imports genuinely disputed factual

propositions." *Id.* at 657.  "The witnesses on both sides come to this case with their own

perceptions, recollections, and even potential biases. It is in part for that reason that genuine

disputes are generally resolved by juries in our adversarial system . . . the fundamental principle

[is] that at the summary judgment stage, reasonable inferences should be drawn in favor of the

nonmoving party." *Id.* at 660.  When considering a motion for summary judgment, courts are

required to view the facts and draw reasonable inferences "in the light most favorable to the party

opposing the [summary judgment] motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam). "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### 2. Counts I and III[5]

Plaintiffs allege in Count I that Officer Chiprez used excessive force when he shot Jones, violating his right to be free from unreasonable seizures guaranteed by the Fourth Amendment and article I, section 8. [ECF No. 85 ¶¶ 72–82]. Both provisions contain essentially identical language. *Compare* U.S. Const. amend. IV ("The right of the people to be secure . . . against unreasonable searches and seizures, shall not be violated . . . .") *with* Iowa Const. art. 1, § 8 ("The right of the people to be secure . . . against unreasonable seizures and searches shall not be violated . . . ."). The United States Supreme Court has held that an excessive force claim is a seizure for constitutional purposes and should be evaluated under an objective reasonableness standard. *Graham v. Connor,* 490 U.S. 386, 395 (1989). The parties agree that standard applies when evaluating an unreasonable seizure claim under both state and federal constitutions.

The test for an unreasonable seizure is relatively straightforward: (1) whether a seizure occurred; and (2) whether the seizure was objectively unreasonable under the circumstances. *See Hawkins v. City of Farmington*, 189 F.3d 695, 702 (8th Cir. 1999). "A 'seizure' occurs only when a citizen is physically touched by law enforcement officers or when he [or she] otherwise submits

---

[5] The Court observes that Count III alleges a claim for arrest without probable cause in violation of the Fourth Amendment and article I, section 8. [ECF No. 85 ¶¶ 92–95]. Although Count III is styled as an arrest without "probable cause," Plaintiffs plead that "Defendants acted unreasonably by using deadly force in order to seize Jones when no such force was justified." *Id.* ¶ 93. Plaintiffs make no other mention of probable cause. Defendants submit that the analysis for the two claims are the same. [ECF No. 96 at 7]. Given the lack of clarity in the pleading, the Court will treat Counts I and III as coextensive claims for excessive force.

to a show of authority by the officers. *Schulz v. Long*, 44 F.3d 643, 647 (8th Cir. 1995) (citing *California v. Hodari D.,* 499 U.S. 621, 626 (1991)). Clearly, the fatal shot by Officer Chiprez constituted a seizure of Jones. *See Estate of Morgan v. Cook*, 686 F.3d 494, 496 (8th Cir. 2012). The parties dispute whether the first seven shots fired by Officer Chiprez—all of which missed their mark—constitute a seizure.

Defendants move for summary judgment on both counts, arguing that the first seven shots fired by Officer Chiprez did not constitute a seizure, and the eighth shot—which did fatally strike Jones—was objectively reasonable under the circumstances.

a.   First seven shots

i.   Fourth Amendment

Prior to any liability for an unreasonable seizure, there must first be a seizure. In *Hodari D.*, the United States Supreme Court addressed what constituted a seizure for Fourth Amendment purposes. There, two police officers on patrol saw a group of minors huddled together on a street corner. 499 U.S. at 622. Once they saw the officers approaching, all the minors fled on foot. *Id.* at 622–23. As he was being pursued by an officer, the defendant discarded an object. *Id.* at 623. The officer eventually caught and tackled the defendant and recovered the discarded object which turned out to be crack cocaine. *Id.* The defendant later moved to suppress the drugs as fruit of an illegal seizure. *Id.* The motion to suppress was denied by the district court, but the denial was reversed by the California Court of Appeal which held that, under *United States v. Mendenhall*, 446 U.S. 544 (1980), the defendant had been seized as soon as he saw the officer running towards him. *Id.* at 623, 628–29. The court found the seizure was unreasonable and the crack cocaine was fruit from that illegal seizure. *Id.* The United States Supreme Court reversed, holding that a seizure requires either physical force to be applied or submission to authority. *Id.* at 626. Because the

defendant had fled rather than submit to the officer's authority, the Court reasoned he had not been seized when he discarded the drugs, so they were admissible.  *Id.*  The Court further elaborated on what constituted an arrest by force: "the quintessential 'seizure of a person' under our Fourth Amendment jurisprudence—the mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing the arrestee, was sufficient . . . ."  *Id.* at 625 (citation omitted).  The Court also discussed the Fourth Amendment implications of an *attempted* seizure:

> To say that an arrest is effected by the slightest application of physical force, despite the arrestee's escape, is not to say that for Fourth Amendment purposes there is a *continuing* arrest during the period of fugitivity.  If, for example, [the officer] had laid his hands upon [the defendant] to arrest him, but [the defendant] had broken away and had then cast away the cocaine, it would hardly be realistic to say that that disclosure had been made during the course of an arrest.

*Id.*

In *Cole v. Bone*, 993 F.2d 1328 (8th Cir. 1993), the United States Court of Appeals for the Eighth Circuit addressed when a seizure occurs for Fourth Amendment purposes.  There, police officers were involved in a high-speed pursuit of a semi-truck on the interstate.  *Id.* at 1330. Throughout the pursuit, officers from the Missouri State Highway Patrol engaged in several tactics to halt the truck as it reached "speeds exceeding ninety miles per hour and [] passed traffic on both shoulders" of the interstate.  *Id.*  Because traffic was congested for the holiday season, and the driver's "demonstrated lack of concern for other travelers," officers decided to use deadly force to halt the chase.  *Id.* at 1331.  Once the troopers were able to get clear of traffic momentarily, an officer shot out the rear window of his patrol car with a shotgun and then "fired two rounds from his revolver at the truck, attempting to disable its engine.  The second shot hit [the driver] in the forehead."  *Id.*  The driver was taken immediately to the hospital where he died from the gunshot

wound. *Id*. The deceased driver's wife and children then brought a § 1983 suit against the officers involved in the pursuit. *Id*. The district court denied the officers' motion for summary judgment on qualified immunity grounds. *Id*. The Eighth Circuit reversed the denial of summary judgment reasoning that the officers had acted with objective reasonableness. *Id*. at 1333. They found that the shooting officer "had probable cause to believe that the truck posed an imminent threat of serious physical harm to innocent motorists as well as to the officers themselves." *Id*. Relevant here, the *Cole* Court examined "only the seizure itself, and not the events leading up to the seizure, for reasonableness under the Fourth Amendment." *Id*. at 1333. Only the seizure was considered because the court found that "[t]he pursuit in and of itself did not constitute a seizure, because it did not produce a stop." *Id*. at 1332 (citing *Hodari D.*, 499 U.S. at 625). "The Fourth Amendment prohibits unreasonable seizures, not unreasonable or ill-advised conduct in general. Consequently, [courts] scrutinize only the seizure itself, not the events leading to the seizure, for reasonableness under the Fourth Amendment." *Id*. at 1333 (internal citations omitted).

Here, Plaintiffs try to distinguish *Cole* due to the degree of danger posed by the pursued individual in each situation, i.e., a runaway semi-truck speeding down a crowded highway versus a single individual fleeing on foot. Furthermore, Plaintiffs argue that *Cole* would "necessitate summary judgment in Jones' favor," [ECF No. 112 at 20], because Defendants could not argue that Officer Chiprez thought Jones had a gun while he was fleeing and *Cole* only examined "the seizure itself, and not the events leading up to the seizure." *Cole,* 993 F.3d at 1333. That is not the holding of *Cole*. The excerpt that Plaintiffs quote about how a court may only consider "the seizure itself" does not mean that a court cannot consider preceding events to inform the reasonableness of a seizure. The Court may only consider "the seizure itself" because anything other than a seizure, such as an attempted seizure, falls outside the purview of the Fourth

Amendment and is not actionable under § 1983.  There was no force applied to Jones by the first

seven shots so the Court finds it was not a seizure by force.

Plaintiffs also argue that Jones submitted to Officer Chiprez's authority by dropping the

gun when told to do so.  Thus, they argue, he was seized at the moment he dropped the gun.

According to Plaintiffs, Jones only continued running to take cover from the hail of bullets from

Officer Chiprez before surrendering on the other side of the block in the backyard where he was

shot.  However, Plaintiffs do not point the Court to any case law which would allow the Court to

make this inference that Jones had submitted to Officer Chiprez's authority by dropping the gun.

Even after dropping the gun in the yard, Jones continued running for at least another block or so.

Plaintiffs' argument invites the Court to speculate as to Jones's motives in a way that is improper

on summary judgment.  *See Solomon v. Petray*, 795 F.3d 777, 788 (8th Cir. 2015) (holding a

"reasonable inference" is one that can be made without resorting to speculation or conjecture).

ii.  Article I, section 8

The parties dispute whether the analysis of a potential unreasonable seizure applies the

same under the Fourth Amendment and article I, section 8.  Plaintiffs argue "the Iowa Supreme

Court would hold that a law enforcement officer firing a gun at an individual in an attempt to take

them into custody constitutes a seizure under article I, section 8, of the Iowa Constitution."  [ECF

No. 112 at 22].  Defendants disagree, responding that both constitutional provisions contain nearly

identical language.  They point to a recent statement by the Iowa Supreme Court that Iowa courts

"generally 'interpret the scope and purpose of the Iowa Constitution's search and seizure

provisions to track with federal interpretations of the Fourth Amendment because of their nearly

identical language."  *State v. Brown*, 930 N.W.2d 840, 847 (Iowa 2019) (citation omitted).

Plaintiffs say that Defendants' reliance on the *Brown* case is misplaced and the Iowa Supreme Court has a long history of independent adjudication of state constitutional issues. *See State v. Coleman*, 890 N.W.2d 284, 287 (Iowa 2017) (collecting cases where the Iowa Supreme Court's interpretation of state constitutional provisions has diverged from the interpretation of analogous federal constitutional provisions by the United States Supreme Court). Plaintiffs insist that the Iowa Supreme Court's decision in *Baldwin v. City of Estherville*, 915 N.W.2d 259 (Iowa 2018) (*Baldwin II*) indicates a desire by Iowa courts to "broadly hold law enforcement officers responsible for wrongful conduct under the Iowa Constitution." [ECF No. 112 at 22].

"When a state's highest court has not decided an issue, it is up to [federal courts] to predict how the state's highest court would resolve that issue." *Church Mut. Ins. Co. v. Clay Ctr. Christian Church*, 746 F.3d 375, 379 (8th Cir. 2014) (quoting *Cont'l Cas. Co. v. Advance Terrazzo & Tile Co., Inc.,* 462 F.3d 1002, 1007 (8th Cir. 2006)). Plaintiffs highlight instances where the Iowa Supreme Court has diverged from federal constitutional interpretation, but those cases address the scope of article I, section 8 pertaining to searches or specific circumstances under which searches and seizures occur.[6] None of the cases cited are nearly as broad as recognizing that an *attempted* seizure is a seizure for constitutional purposes, however.

The Court is also influenced by recent decisions in *Brown* and *State v. Fogg*, 936 N.W.2d 664 (Iowa 2019), both cases in which the Iowa Supreme Court had an opportunity to expand seizure protections under the Iowa Constitution but declined to do so. In *Brown*, the court

---

[6] *See Coleman*, 890 N.W.2d at 301 (extension of a traffic stop); *State v. Short*, 851 N.W.2d 474, 507 (Iowa 2014) (warrantless search of probationer's home); *State v. Baldon*, 829 N.W.2d 785, 803 (Iowa 2013) (warrantless search of parolee's home); *State v. Pals*, 805 N.W.2d 767, 782 (Iowa 2011) (consent to search vehicle); *State v. Ochoa*, 792 N.W.2d 260, 292 (Iowa 2010) (warrantless search of hotel room) *State v. Tague*, 676 N.W.2d 197, 206 (Iowa 2004) (probable cause for traffic stop).

considered whether to deviate from Fourth Amendment interpretation to scrutinize an officer's subjective motivations in probable cause analysis for traffic stops under article I, section 8. 930 N.W.2d at 848; *see Whren v. United States*, 517 U.S. 806, 813 (1996) (holding "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis"). The *Brown* Court declined to adopt the burden-shifting framework proposed by the petitioners there, instead finding that the Iowa Supreme Court's prior approval of *Whren* was not "clearly erroneous." *Brown*, 930 N.W.2d at 854.

In *Fogg*, a petitioner challenged what she alleged was a seizure when a police officer parked his squad car at the end of an alley that was only wide enough for one-way traffic. 936 N.W.2d at 666. The petitioner challenged the stop under both the U.S. and Iowa Constitutions but the court in *Fogg* applied the federal framework and did not exercise its "right to apply the federal framework in a different manner." *Id*. at 667 (quoting *In re Det. of Anderson*, 895 N.W.2d 131, 139 (Iowa 2017)). Because the officer did not block the petitioner in, or activate his emergency lights, the court held that no seizure occurred. *Id*. at 670.

Accordingly, the Court predicts that if the Iowa Supreme Court were presented with the issue of whether an attempted seizure is a seizure under article I, section 8, it would hold that it is not and would not deviate from the federal interpretation that an attempted seizure does not constitute a seizure. As such, the first seven shots fired by Officer Chiprez is not cognizable under article I, section 8 as an unreasonable seizure.

b. Fatal shot

Both parties agree that the eighth shot Officer Chiprez fired, the fatal shot, was a seizure. The question before the Court is therefore whether the eighth shot was objectively unreasonable and amounted to excessive force.

"To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." *Coker v. Ark. State Police*, 734 F.3d 838, 842 (8th Cir. 2013) (quoting *Henderson v. Munn*, 439 F.3d 497, 502 (8th Cir. 2006)).[7]  "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Tennessee v. Garner,* 471 U.S. 1, 11 (1985).

When courts evaluate the reasonableness of a seizure they must pay close attention "to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396.  Courts are to "avoid judging an officer's split-second decision (made with imperfect information) against one [a court] would make with a complete record and the benefit of hindsight." *Goffin v. Ashcraft*, 977 F.3d 687, 691 (8th Cir. 2020) (citing *Plumhoff v. Rickard*, 572 U.S. 765, 775 (2014)).

An officer may not use deadly force on an unarmed suspect who poses no danger. *Garner*, 471 U.S. at 11.  Jones, by the time of the eighth shot, had divested himself of the gun and was not otherwise known to Officer Chiprez to be otherwise dangerous.  Defendants point to Officer

---

[7] Iowa also appears to require objective reasonableness under its constitution as the standard for excessive force under article I, section 8.  The Iowa Supreme Court has not made a specific pronouncement on the standard, but two federal courts in the Northern District of Iowa have concluded that an analogous statute provides guidance.  *See McElree v. City of Cedar Rapids, Iowa*, 372 F. Supp. 3d 770, 792 n. 24 (N.D. Iowa 2019) (citing *Chelf v. Civil Serv. Comm'n*, 515 N.W.2d 353, 355–56 (Iowa Ct. App. 1994)); *Church v. Anderson*, 249 F. Supp. 3d 963, 979 (N.D. Iowa 2017) ("Over thirty years ago, the Iowa Supreme Court concluded that, in light of [Iowa Code § 804.8], 'an assault only occurs if the peace officer does not reasonably believe the particular force was necessary in the circumstances.'") (quoting *Johnson v. Civil Serv. Comm'n*, 352 N.W.2d 252, 257 (Iowa 1984)).

Chiprez's statements that he did not know that Jones had dropped the gun.  "An act taken based on a mistaken perception or belief, if objectively reasonable, does not violate the Fourth Amendment.  Even if a suspect is ultimately 'found to be unarmed, a police officer can still employ deadly force if objectively reasonable.'"  *Loch v. City of Litchfield*, 689 F.3d 961, 966 (8th Cir. 2012) (citations omitted).

However, at this stage the Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment."  *Tolan*, 572 U.S. at 656.  Viewing the facts in the light most favorable to Plaintiffs, the Court finds there are two genuine disputes of material fact that must be resolved before the reasonableness of the eighth shot can be determined: (1) whether Officer Chiprez saw Jones drop the gun when he ordered him to; and (2) whether Officer Chiprez was unreasonable in believing Jones was taking a firing position rather than surrendering.

The United States Supreme Court and the Eighth Circuit has been clear that courts are not to make inferences of fact on summary judgment in favor of the moving party.  *See Tolan*, 572 U.S. at 660 ("[G]enuine disputes [of fact] are generally resolved by juries in our adversarial system."); *Coker*, 734 F.3d at 843 ("Making credibility determinations or weighing evidence in this manner is improper at the summary judgment stage, and 'it is not our function to remove the credibility assessment from the jury.'" (citation omitted));  This is particularly true in cases concerning qualified immunity.   *See Bell v. Kansas City Police Dep't*, 635 F.3d 346, 347 (8th Cir. 2011) (denying qualified immunity because plaintiff's version of the facts that a reasonable officer would have known he was complying with the officers' orders just before being tasered); *Gardner v. Buerger*, 82 F.3d 248, 251 (8th Cir. 1996) ("[I]f misused, judgment as a matter of law can invade the jury's rightful province.").

The similarities between this case and *Wealot v. Brooks*, 865 F.3d 1119 (8th Cir. 2017), are notable. In *Wealot*, police officers were responding to a service call about a disturbance at a residence. *Id.* at 1122. While the officers were speaking with a neighbor, a man fired multiple shots at a van carrying a group of people involved in the disturbance before running toward his backyard and disposing the gun as he ran. *Id*. at 1123. The officers heard the gunshots and chased the man on foot with each officer taking a different route in pursuit. *Id.* One of the officers caught up to the man when he began to turn around and the officer shot him eight times. *Id.* The man's family sued for excessive force and the district court granted summary judgment, finding no reasonable jury could find the use of force unreasonable. *Id.*

The Eighth Circuit reversed the grant of summary judgment, finding that "two genuine disputes of material fact must be resolved: (1) whether the officers saw [the man] throw his gun and therefore knew he was unarmed, and (2) whether [the man] was turning around to the officers with his hands raised to surrender." *Id.* at 1125. It found that in granting summary judgment in favor of the officers, the district court had made an impermissible inference of fact by assuming the officers did not see the man throw the gun because the witnesses who did see him dispose of the gun saw it from "different angles and directions." *Id.* at 1126. The Eighth Circuit contrasted *Wealot* from *Loch*, a case where it had affirmed the grant of qualified immunity for an officer who had shot an unarmed suspect after he had discarded his gun. *Id*. The difference from *Loch*, the court explained, was that plaintiffs in that case "acknowledged that the officer could not have seen the suspect discard his gun because he did so before the officer arrived." *Id.* (citing *Loch*, 689 F.3d at 966).

Here, the gun was located at the exact spot where Officer Chiprez ordered Jones to drop the gun as he fired at him. Officer Chiprez testified that he did not see Jones drop the gun because

he "was concentrating on my front sight, center mass of [Jones]," so that was his "only focus at the time as [he] was shooting." [ECF No. 94 at 38] (sealed). After firing off the first seven shots, Officer Chiprez ran to the top of the hill. Plaintiffs assert he looked down at the items and saw a gun in the grass. Officer Chiprez claims he never saw the gun in the grass. *Id.* at 39. The question of whether Officer Chiprez saw, or knew Jones dropped the gun, is a question of fact for a jury, not for the Court on summary judgment.

The other genuine dispute of material fact is Jones's conduct immediately before the eighth shot. Defendants argue that Officer Chiprez reasonably believed that Jones was still armed and he was raising his hands in a manner consistent with preparing to open fire. Plaintiffs claim that because Jones had already disposed of the gun, his going to the ground was an act of surrender. It is within the province of a jury to determine whether Officer Chiprez's perceptions were objectively reasonable regarding Jones's actions in the backyard given the factual dispute between the parties.

The Court does acknowledge that whether the use of force is constitutionally excessive is a question of law, *Davis v. White*, 794 F.3d 1008, 1013 (8th Cir. 2015), but when there are genuine disputes of material fact as to the facts leading up to the use of force, the case should not be resolved on summary judgment. *See Bell*, 635 F.3d at 347 ("The dispute was material, because it bears on whether the use of force was objectively reasonable under the circumstances.").

c.   Qualified immunity

The Court's finding of the existence of genuinely disputed material facts controls whether Defendants are entitled to qualified immunity here. Government officials are qualifiedly immune from damages under § 1983 unless their conduct violates "a clearly established constitutional or statutory right of which a reasonable person would have known." *Winslow v. Smith*, 696 F.3d

716, 730 (8th Cir. 2012) (citation omitted).  Qualified immunity analysis has two steps: (1) whether the plaintiff has alleged sufficient facts that, if true, show a violation of a constitutional right; and (2) whether the right was "clearly established" at the time of the defendant's alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Pearson v. Callahan,* 555 U.S. 223, 236–43 (2009) (finding "the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory.").  In assessing Plaintiffs' claim, the Court must view the facts in the light most favorable to Plaintiffs "to determine whether a constitutional violation occurred and whether any violation of a constitutional right was clearly established." *K.W.P. v. Kansas City Pub. Sch.*, 931 F.3d 813, 821 (8th Cir. 2019).

Plaintiffs have advanced sufficient facts that, if true, show Defendants violated Jones's constitutional right to be free from unreasonable seizures by using deadly force after he was unarmed.  After Jones had discarded the gun, Officer Chiprez had no reason to believe that Jones was danger if the jury believes he saw Jones discard it.  The traffic stop was initiated for a municipal noise ordinance and neither Officer Chiprez nor Officer Riffel were familiar with Jones or had any knowledge of his dangerousness other than the gun.  Once Jones was no longer armed, the threat had dissipated to the extent that deadly force was legally justified.

"Since 1985, it has been established by the Supreme Court that the use of deadly force against a fleeing suspect who does not pose a significant threat of death or serious physical injury to the officer or others is not permitted." *Moore v. Indehar*, 514 F.3d 756, 763 (8th Cir. 2008) (determining that a jury could find the officer's use of deadly force against an unarmed person fleeing the scene of a shooting objectively unreasonable); *see also Wallace v. City of Alexander*, 843 F.3d 763, 769 (8th Cir. 2016)  ("[A]n officer violate[s] *Garner* by using deadly force to seize an individual who did not possess a weapon and was attempting to flee the scene of

a potentially violent crime."); *Craighead v. Lee*, 399 F.3d 954, 962 (8th Cir. 2005) ("At least since *Garner* was decided . . . officers have been on notice that they may not use deadly force unless the suspect poses a significant threat of death or serious physical injury to the officer or others."). Thus, the constitutional prohibition against the use of deadly force against an unarmed, non-dangerous suspect was clearly established by the time of these events in October 2017, precluding qualified immunity if the jury believes Officer Chiprez knew Jones to be unarmed at the time he fired the fatal shot.

### d.  "Exercise of Due Care" Immunity under Iowa Constitution

Iowa's standard for immunity of government officials in constitutional tort cases is whether they exercised "due care" in the course of their duties. *Baldwin II*, 915 N.W.2d at 281.  The Iowa Supreme Court has held that "lack of due care" amounts to "proof of negligence" and "a government official whose conduct is being challenged will not be subject to damages liability if she or he pleads and proves as an affirmative defense that she or he exercised all due care to conform to the requirements of the law." *Id.* at 280–81.

In light of its conclusion that genuine disputes of material fact precludes an analysis of the objective reasonableness of Officer Chiprez's actions, the Court cannot find that Officer Chiprez "exercised all due care" to conform to the objective reasonableness standard under the Iowa Constitution.  Defendants are not entitled to immunity under the Iowa Constitution on summary judgment.  In sum, Defendants' Motion for Summary Judgment on Counts I and III is DENIED.

### 3.  Count II

Count II of Plaintiffs' Complaint alleges Defendants violated Jones's substantive due process rights under the Fourteenth Amendment of the United States Constitution and article I,

section 9 of the Iowa Constitution when Officer Chiprez shot Jones "in an unreasonable, unnecessary and/or reckless manner." [ECF No. 85 ¶ 83]. The standard for violation of an individual's substantive due process rights is conduct "inspired by malice or sadism rather than a merely careless or unwise excess of zeal [such] that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *Keefe v. City of Minneapolis*, 785 F.3d 1216, 1223 (8th Cir. 2015) (quoting *Moran v. Clarke*, 296 F.3d 638, 647 (8th Cir. 2002)). Both parties agree that the standard under the state and federal constitutions is the same. According to Plaintiffs, because Officer Chiprez shot Jones after he witnessed Jones drop his gun and knew he was unarmed, the use of deadly force was "so egregious and outrageous as to shock the conscience." [ECF No. 85 ¶ 87]. Defendants move for summary judgment on Count II arguing that any claim for excessive force in effecting an arrest must be brought under the Fourth Amendment's unreasonable seizure clause, not the Fourteenth Amendment's substantive due process clause.

The Supreme Court's precedent on the appropriate vehicle for alleged constitutional violations arising from excessive force is clear: it is the Fourth Amendment's unreasonable seizure clause, not the Fourteenth Amendment's substantive due process clause. "[A]*ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham*, 490 U.S. at 395 (1989).

The Supreme Court has said that does not mean any claims "relating to physically abusive government conduct" must be brought under the Fourth Amendment, but rather "if a constitutional claim is covered by a specific constitutional provision . . . the claim must be analyzed under the

standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997); *see also Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) ("Where a particular [a]mendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." (citation omitted)).  Since the alleged constitutional violation here clearly falls within bounds of the Fourth Amendment's unreasonable seizures provision, the Court will apply that standard.

Both parties indicated during oral arguments on January 13, 2021 that the Iowa Supreme Court has not addressed whether article I, section 9 would be an appropriate vehicle for an unreasonable seizure under the Iowa Constitution.  The Court has already recognized the Iowa Supreme Court's interpretation of article I, section 8 generally "track[s] with federal interpretations of the Fourth Amendment."  *Brown*, 930 N.W.2d at 847.  The Court has also determined that the Iowa Supreme Court's interpretation of a seizure under the Iowa Constitution would not deviate from the federal standard with regard to an "attempted seizure."  Accordingly, the Court sees no reason why Iowa courts would depart from federal interpretation to allow an unreasonable seizure to be pursued under article I, section 9, particularly when article I, section 8 is available. Defendants' Motion for Summary Judgment on Count II is GRANTED.

a.   City of Burlington Liability

Although the Court has determined that genuine disputes of material fact exists as to whether the shooting of Jones was a constitutional violation, it must still evaluate if any liability exists for the City of Burlington on Plaintiffs' constitutional claims.  The United States Supreme Court has held that local governments and municipalities are "persons" within the meaning of §

1983 and may be liable for damages arising from constitutional violations. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978). A § 1983 claim may not lie against a municipality under a *respondeat superior* theory, but when the "injury inflicted" occurs during the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* at 694. To succeed on a § 1983 claim against a municipality, Plaintiffs must establish "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

Plaintiffs argue that the City of Burlington has an "official policy of allowing officers to shoot and kill unarmed citizens without consequence." [ECF No. 112 at 33]. A policy, for *Monell* purposes, "is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999).

Plaintiffs offer a previous excessive force lawsuit against the City from 2016 in support of their argument of a policy of impunity by the City as it relates to excessive force used by their officers. Compl., *Steele v. City of Burlington*, 3:16-cv-00105-JEG-SBJ ("*Steele* Case") (S.D. Iowa Nov. 14, 2016), ECF No. 1. A settlement was reached in that case and the suit was dismissed. *See*, Joint Stipulation of Dismissal, *Steele* Case, ECF No. 94.

Defendants insist that a prior lawsuit, which was settled without an admission of liability, is not evidence for *Monell* liability. Plaintiffs do not explain, in the absence of evidence of an admission of liability in the *Steele* Case, how it would be relevant in determining the City's *Monell*

liability in this case.[8]  The facts in the *Steele* Case are also distinct from this case as Plaintiffs describe the officer's conduct in that case as "reckless" where here Plaintiffs assert that Officer Chiprez deliberately shot Jones after he saw him drop the gun.  There is also a longstanding recognition that public policy favors compromise and settlement of disputes and such evidence is likely inadmissible.  *See* Fed. R. Evid. 408 advisory committee notes to 1972 proposed rules ("While [Rule 408] is ordinarily phrased in terms of offers of compromise, it is apparent that a similar attitude must be taken with respect to completed compromises when offered against a party thereto.").  The Court is hesitant to undermine this policy "by disincentivizing municipalities from ever settling claims for fear that the settlements would later be used against them."  *Webb v. City of Waterloo*, No. 17-CV-2001-CJW-MAR, 2020 WL 1159755, at *12 (N.D. Iowa Mar. 10, 2020). Plaintiffs accurately point out that the settlement is public, which they argue would reduce any concern for disincentivizing municipalities from settling cases.  But the concern remains on the point of admission of liability.  Because the City never admitted liability in the *Steele* case, allowing Plaintiffs to admit the settlement as evidence for liability in a later case, would still serve as a deterrent for settlement.  The Court does not wish to weaken public policy favoring settlements, especially when no liability was admitted in the settlement.

Plaintiffs' next rationale for liability on the part of the City is based on a failure to properly train Officer Chiprez in the use of deadly force.  The core of Plaintiffs' failure to train claim is that the Burlington Police Department's guidelines on the use of deadly force are constitutionally deficient because they do not require a warning be given prior to the use of deadly force.  [ECF No. 112-3 at 38–39].  Because *Garner* mandates a warning be provided prior to use of deadly force

---

[8] The settlement agreement in the *Steele* case is not in the record, but Defendants assert there was no admission of liability by the City, a point Plaintiffs do not dispute.

when feasible, Plaintiffs maintain that Burlington's failure to include such a requirement in their use of force guidelines is a constitutional violation.  *See Garner*, 471 U.S. at 12.  Defendants respond to this argument by pointing out that a policy does not become unconstitutional simply because it does not contain every constitutional requirement, to which the Court agrees.  Even if a policy fails to include every constitutional requirement for the use of a deadly force, that does not render the policy unconstitutional.

Finally, Plaintiffs allege that the City both ratified Officer Chiprez's behavior and participated in its cover up.  For support of their ratification theory, Plaintiffs cite *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988), for the proposition that "when a subordinate's decision is subject to review by the municipality's authorized policymakers . . . [i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."  *Id.* at 127.  According to Plaintiffs, the ratification of Officer Chiprez's use of deadly force occurred when Lieutenant Greg Allen of the Burlington Police Department issued a report finding that no violation of department policy had occurred.  *See* [ECF No. 112-3 at 68–69].

Plaintiffs misconstrue *Praprotnik*.  The Supreme Court in that case was analyzing when "a decision on a single occasion may be enough to establish an unconstitutional municipal policy."  *Praprotnik*, 485 U.S. at 123.  The quote cited by Plaintiffs comes during a discussion about the identification of policymaking officials.  *Id.* at 124.  The Court addressed the occasions when municipal policymaking officials try to "insulate themselves from liability for unconstitutional policies" because they have delegated their policymaking authority to other officials who are not policymaking officials for purposes of § 1983.  *Id.*  Near the end of the discussion, the court noted that a previous Supreme Court case, *Pembaur v. Cincinnati*, 475 U.S. 469 (1986), recognized that

"the authority to make municipal policy is necessarily the authority to make *final* policy" but when "a subordinate's decision is subject to review" by the appropriate policymakers, if those policymakers "approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality." *Id.* at 127. Nothing in *Praprotnik* supports that a review of a discrete incident for compliance with existing municipal policies is ratification for *Monell* purposes.

Plaintiffs also argue that the City is liable for damages based on their alleged cover-up of the incident after the fact. The alleged cover-up involves other claims in Plaintiffs' lawsuit addressed in this Order, *infra*, including: the City's refusal to release footage from Officer Chiprez's body camera immediately after the shooting; Plaintiffs' allegation that witnesses from the Burlington Police Department coordinated their deposition testimony; and a comment by Burlington Chief of Police Douglas Beaird that he would only release body camera video upon court order. Plaintiffs do not elaborate on how any of these allegations, even if true, amount to a violation of a constitutional right required for a recovery of damages under § 1983. Defendants' Motion for Summary Judgment on the liability of the City on Plaintiffs' federal constitutional claims is GRANTED.

The Iowa Supreme Court has recognized that *respondeat superior* liability is actionable under the Iowa Constitution against municipalities for conduct by their employees acting within the scope of their job duties. *See Baldwin v. City of Estherville*, 929 N.W.2d 691, 696 (Iowa 2019) (*Baldwin IV*). In *Baldwin IV*, the court also held that a municipal employer may assert a claim of qualified immunity if their employee exercised "all due care." *Id.* at 701–02. Given the Court's conclusion that Officer Chiprez lacks immunity under the "all due care" exception on the summary

judgment record, the Defendants' Motion for Summary Judgment on the liability of the City under the Iowa Constitution is DENIED.

### 4.   Count IV

Count IV of Plaintiffs' Complaint alleges the City violated the Fourth Amendment and article I, section 8 when they retained a cellular telephone Jones was carrying at the time of the shooting for approximately a year and a half after the completion of the criminal investigation into the shooting.  [ECF No. 85 ¶¶ 96–101].  According to Plaintiffs, the telephone belonged to a McKenzie Hill, a fact Plaintiffs assert was known to the City of Burlington as early as October 3, 2017.  [ECF No. 90-3 at 20].  Plaintiffs do not challenge the initial seizure of the telephone but the City's failure to return it for a year and a half, a length of time they allege was constitutionally unreasonable.  In their Motion, they recount counsel's efforts to track down and retrieve the cellular telephone from authorities in March 2019, including sending correspondences to various law enforcement agencies involved in the investigation.

At oral argument, Plaintiffs recognized the challenges of establishing standing relevant to Count IV and advised they would be withdrawing the claim.  Accordingly, Plaintiffs' Motion for Summary Judgment on Count IV is DENIED;  Defendants' Motion for Summary Judgment is GRANTED.

### 5.   Count V

In Count V, Plaintiffs assert a wrongful death claim against the City and Officer Chiprez. The Court previously ruled on a motion to dismiss and ruled that the wrongful death claim against the City was dismissed.  [ECF No. 41 at 19].  The Court denied the motion to dismiss as to Officer Chiprez.  *Id.*  Plaintiffs acknowledge the Court's previous ruling and represent that the inclusion

of the claim against the City in the Second Amended Complaint was in error.  Summary judgment as it pertains to the City on Count V is therefore GRANTED.

Plaintiffs' wrongful death claim against Officer Chiprez remains.  Defendants now move for summary judgment on that claim arguing that Iowa Code § 804.8 entitles him to immunity or, alternatively, he is immune pursuant to Iowa Code § 670.4(1)(k).  The Court will address these argument in turn.

Iowa law authorizes police officers, if making a lawful arrest, to use "any force which the peace officer reasonably believes to be necessary to effect the arrest or to defend any person from bodily harm while making the arrest."  Iowa Code § 804.8(1).  Deadly force is justified under the statute when "[t]he peace officer reasonably believes the person would use deadly force against any person unless immediately apprehended."  *Id.*  This provision has been interpreted by Iowa courts to be the same objective reasonableness standard applied in *Graham*.  *Chelf*, 515 N.W.2d at 355–56.  Because the Court has already determined there exists a genuine dispute of material fact under *Graham*'s objective reasonableness standard, a grant of immunity pursuant to § 804.8 is inappropriate on summary judgment in this case.

Defendants' alternative basis for immunity for Officer Chiprez is pursuant to Iowa Code § 670.4(1)(k), the Iowa Municipal Tort Claims Act ("IMTCA").  The IMTCA "does not expand any existing cause of action or create any new cause of action against a municipality."  Iowa Code § 670.4(3).  Rather, the IMTCA waived sovereign immunity in some cases by providing that municipalities are liable "for its torts and those of its officers and employees, acting within the scope of their employment or duties, whether arising out of a governmental or proprietary function."  Iowa Code § 670.2(1); *see also Thomas v. Gavin*, 838 N.W.2d 518, 521 (Iowa 2013) (explaining the IMTCA abolished "traditional common law immunities" such as sovereign

29

immunity).   Municipalities are entitled to qualified immunity on various types of claims enumerated in § 670.4 including those "based upon or arising out of an act or omission in connection with an emergency response including but not limited to acts or omissions in connection with emergency response communications services." *Id.* § 670.4(1)(k) (2017).[9]

Although the IMTCA concerns claims against municipalities (as opposed to its employees), the Act provides that "[a]ll officers and employees of municipalities are not personally liable for claims which are exempted under section 670.4." *Id.* § 670.12.  The statutory terms "in connection with" or "emergency response" have not been defined by either the Iowa Legislature or the Iowa Supreme Court.  *Adams v. City of Des Moines*, 629 N.W.2d 367, 370 (Iowa 2001). However, the Iowa Supreme Court has observed that the Iowa Legislature intended a wide scope under the immunity provision.  *Cubit v. Mahaska Cty.*, 677 N.W.2d 777, 782 (Iowa 2004) (finding the "statute sweeps broadly");  *see Kulish v. Ellsworth,* 566 N.W.2d 885, 890 (Iowa 1997) (noting "in connection with" is a broad term conveying a legislative intent to encompass a wide range of situations).

Plaintiffs point out that Jones was pulled over for a municipal noise violation, so they argue no emergency response existed.  Plaintiffs rely on *Stych v. City of Muscatine*, 655 F. Supp.2d 928 (S.D. Iowa 2009), for its proposition that a traffic stop cannot qualify as an emergency response. In *Stych*, the plaintiff ran a stop sign, for which a police officer initiated a traffic stop.  *Id.* at 936. The driver continued for about one-half mile before stopping.  *Id*.  The court in *Stych* found that "[i]f routine traffic violations such as failure to stop at a stop sign are deemed emergencies, there

_____

[9] The Court notes that in 2019 the Iowa Legislature amended the quoted language.  It now provides, in relevant part, "claim[s] based upon or arising out of an act or omission *of a municipality* in connection with an emergency response."   Iowa Code § 670.4(1)(k) (2019) (emphasis added).

is little doubt that the emergency response *exception* would swallow the rule that municipalities are ordinarily liable for tortious acts under the statutory waiver of sovereign immunity." *Id.* It also dismissed the defendants' argument that the failure to stop immediately necessitated an "emergency response," calling that argument only "slightly more compelling." *Id.* The *Stych* Court did not find the situation similar to *Cubit*, where "a high speed chase of a fleeing criminal suspect was determined to be within the broad definition of an emergency response under § 670.4(11)." *Id.* (quoting *Cubit*, 677 N.W.2d at 779). In *Stych*, the district court found that the plaintiff "at worst, ran a stop sign and, in failing to immediately pull over in response to [the officer's] lights and siren, traveled at approximately 55 miles-per-hour in a 35 mile-per-hour zone for a distance of just over one-half a mile." *Id.* at 937. This was "far short of being comparable to any situation in Iowa case law that has supported application of the emergency response exception." *Id.*

Plaintiffs also rely on *State v. Iowa Dist. Ct. for Scott Cty*, 889 N.W.2d 467 (Iowa 2017). That case did not involve immunity under IMTCA but the Iowa Supreme Court was asked to determine what constituted an emergency response for purposes of "emergency response restitution" under Iowa Code § 321J.2. *Id.* at 469. The court there found that restitution was improper in the case because the "emergency" involved a drunk driving violation which the court found was "[r]outine law enforcement activities" that did not "meet[] the normal definition of emergency." *Id.* at 468–69.

The Court does not think this case amounts to a simple traffic stop, or "routine police work," as Plaintiffs characterize these events. Rather, the Court finds this case comparable to *Sero v. City of Waterloo*, No. C08-2028, 2009 WL 2475066, (N.D. Iowa Aug. 11, 2009). The court in *Sero* found the emergency response immunity applied to claims involving police actions in

connection with an unarmed individual fleeing officers on foot. *Id.* at *17. The events giving rise to Plaintiffs' wrongful death claim is "based upon" an act—the use of deadly force against Jones by Officer Chiprez—committed in connection with an emergency response. *See* Iowa Code § 670.4(1)(k). Officer Chiprez was responding to an emergency when Jones fled from a traffic stop. Jones ran from police officers through a residential neighborhood while armed with a gun. He resisted verbal commands to stop and continued to flee after escaping a physical altercation with Officer Riffel. Officer Chiprez's use of deadly force "arose out of and was related to" that emergency. *See Seymore v. City of Des Moines*, 519 F.3d 790, 802 (8th Cir. 2008). This conclusion is consonant with the Iowa Supreme Court's guidance that courts should distinguish between an emergency and the emergency response: "the real issue . . . is whether the [employee's] action was done 'in connection with an emergency response.'" *Adams*, 629 N.W.2d at 370.

Plaintiffs alternatively contend that, if Officer Chiprez was entitled to immunity, he acted outside the scope of his authority. [ECF No. 85 ¶ 109]. This argument fails too. Officer Chiprez was on patrol, in a patrol vehicle and wearing a police uniform, along with another officer from the Burlington Police Department. Officer Chiprez is entitled to immunity for claims for wrongful death under the emergency response exception to the IMTCA. Defendants' Motion for Summary Judgment on Count V is GRANTED.

### 6.   Count VI

Defendants also move for summary judgment on Count VI, contending that if the Court finds that Defendants are not liable for the other claims, they must also prevail as a matter of law on Count VI because loss of consortium is derivative of other tort claims. *See James ex rel. James v. Burlington Northern, Inc.*, 587 N.W.2d 462, 464–65 (Iowa 1998) (dismissing claims for loss of

consortium when a railroad found to be not liable for a motorist's injuries).  Given the Court's determination of disputed material facts precluding summary judgment on some claims, the loss of consortium may proceed.  Defendants' Motion for Summary Judgment on Count VI is DENIED.

### 7.   Count VII

Count VII of Plaintiffs' Complaint is for violation of Iowa open records law.  Plaintiffs allege the City illegally refused records requests for records related to the facts and circumstances of the shooting.  [ECF No. 85 ¶¶ 117–25].

### a.   Iowa Code Chapter 22

Plaintiffs allege that "[t]he tactics of the City of Burlington, along with other government entities, including the State of Iowa, intent on keeping government wrongdoing secret have made it fruitless and impossible to properly enforce Iowa's open records laws." *Id.* ¶ 123.  They request the Court order the City to "release all information regarding the shooting death of Marquis Jones." *Id.* ¶ 124.

Iowa Code chapter 22 "essentially gives all persons the right to examine public records . . . [subject to] specific categories of records that must be kept confidential." *Am. Civ. Liberties Union Found. of Iowa, Inc. v. Recs. Custodian, Atl. Cmty. Sch. Dist.*, 818 N.W.2d 231, 233 (Iowa 2012).  These confidential categories are to be "construed narrowly." *Iowa Film Prod. Servs. v. Iowa Dep't of Econ. Dev.*, 818 N.W.2d 207, 219 (Iowa 2012) (quoting *Hall v. Broadlawns Med. Ctr.*, 811 N.W.2d 478, 485 (Iowa 2012)).  "The purpose of [chapter 22] is 'to open the doors of government to public scrutiny [and] to prevent government from secreting its decision-making activities from the public, on whose behalf it is its duty to act.'" *Mitchell v. City of Cedar Rapids*,

926 N.W.2d 222, 229 (Iowa 2019) (quoting *City of Riverdale v. Diercks*, 806 N.W.2d 643, 652 (Iowa 2011)).  "'There is a presumption in favor of disclosure' and 'a liberal policy in favor of access to public records.'  'Disclosure is the rule, and one seeking the protection of one of the statute's exemptions bears the burden of demonstrating the exemption's applicability.'"  *Id.*

> The exemption at issue here is found at Iowa Code § 22.7:

> The following public records shall be kept confidential . . .
> 5. [p]eace officers' investigative reports . . . .  However, the date, time, specific location, and immediate facts and circumstances surrounding a crime or incident shall not be kept confidential . . . except in those unusual circumstances where disclosure would plainly and seriously jeopardize an investigation or pose a clear and present danger to the safety of an individual.

Iowa Code § 22.7(5).

In *Hawk Eye v. Jackson*, 521 N.W.2d 750, 752–53 (Iowa 1994), the Iowa Supreme Court set out a balancing test based on a privilege in a related provision, Iowa Code § 622.11.[10]  The balancing test in *Hawk Eye* applies equally to both statutory provisions that "express essentially the same legislative purpose" and requires: "[a]n official claiming the privilege [of § 622.11] must satisfy a three-part test: (1) a public officer is being examined, (2) the communication was made in official confidence, and (3) the public interest would suffer by disclosure." 521 N.W.2d at 753 (citing *State ex rel. Shanahan v. Iowa Dist. Ct.,* 356 N.W.2d 523, 527 (Iowa 1984)).  The *Hawk Eye* balancing test applies to "disputes over access to police investigative reports under [§] 22.7(5)." *Mitchell*, 926 N.W.2d at 234.

Defendants argue that because the statute provides peace officer investigative reports "shall be kept confidential" that they do not need to be released upon request.  Defendants also point to

---

[10] Section 622.11 provides:
"A public officer cannot be examined as to communications made to the public officer in official confidence, when the public interests would suffer by the disclosure."

the Iowa Supreme Court's holding in *Mitchell* that police investigative reports remain confidential under § 22.7(5) even after the investigation ends. 926 N.W.2d at 232. Because police reports are still confidential after the close of an investigation, Defendants say that the City performed the balancing test set out in *Hawk Eye*, but the City's attorney requested Plaintiffs specify the public interests which would be furthered by the release of the requested records but Plaintiffs failed to furnish any interests. Also, Defendants argue that Iowa courts have never required government agencies to perform the *Hawk Eye* balancing test; rather, they contend the test is merely a tool for courts (or the Iowa Public Information Board).[11]

Plaintiffs respond that the City selectively uses the "date, time, specific location, and immediate facts and circumstances," clause as sword and a shield; when its officers are accused of wrongdoing, an exculpatory fact is public, and an inculpatory fact is confidential. Plaintiffs say this cannot be the rule, and the Court agrees on that point.

The Iowa Supreme Court in *Mitchell* set forth several factors for determining whether information is confidential within the meaning of § 22.7(5). Among these factors are: (1) the need for confidentiality is greater when reports are based on confidential informants; (2) whether the information at issue references "named but innocent suspects"; and (3) whether the investigation is ongoing, such that public disclosure would hinder the investigation. *Mitchell*, 926 N.W.2d at 233.

---

[11] The Iowa Public Information Board is vested by the Iowa Code with the power, among other things, to: issue declaratory orders determine the applicability of the Iowa open records law to specific fact situations; issue informal advice concerning the applicability of the Iowa open records law; investigate formal complaints of violations of the Iowa open records law; prosecute violations of the Iowa open records law in an administrative proceeding; examine a confidential record that is subject to a complaint; and issue subpoenas enforceable in court for purposes of investigating complaints. *See generally* Iowa Code § 23.6.

Assessing the public interest in transparency of the reports, the *Mitchell* Court emphasized that allegations of excessive force is a significant factor in the public interest in transparency. *Id.* It also stated clearly that "allegations of leniency or cover-up . . . are matters of great public concern." *Id.* (quoting *Hawk Eye*, 521 N.W.2d at 753). The court implied that the specific circumstances of the *Mitchell* case—the alleged use of excessive force by a white police officer on an African-American—increased the public interest in transparency as well. *Mitchell*, 926 N.W.2d at 234.

Defendants have not demonstrated that the test set forth in *Mitchell* and *Hawk Eye* weigh in their favor. To the contrary, it is rather clear that the balance of interests weigh in favor of transparency. Defendants have not claimed that any of the *Mitchell* factors are present here, i.e., confidential informants or innocent suspects. The criminal investigation was completed weeks after the incident. The factors in *Mitchell*, the use of force by a police officer on a black citizen, allegations of leniency or cover-up, are all present here. Defendants are therefore ORDERED to release any disputed materials that have not yet been made available to the public. This order does not include, however, any records or reports prepared by the City for internal review or disciplinary purposes. *See Mitchell*, 926 N.W.2d at 235 (approving the district court's order excluding "reports or memorandum generated solely for purposes of a police internal review of the incident.").

Plaintiffs ask the Court to sanction Defendants for their "claim of blanket protection for all police investigative reports" without conducting the balancing test required by *Mitchell* and *Hawk Eye*. Plaintiffs assert that a Show Cause order "is the only way this repeat offender is going to learn a lesson." The Court declines this invitation. Plaintiffs' Motion for Partial Summary Judgment on Count VII is GRANTED; Defendants' Motion is DENIED.

### B.  Plaintiffs' Motion for Sanctions

On October 23, 2020, Plaintiffs filed a Motion for Sanctions related to a deposition taken during discovery.  The depositions of Officer Chiprez and Officer Riffel were taken on September 1, 2020.  During the deposition, Plaintiffs' counsel asked each a series of questions based upon photographs taken from the scene of the shooting about where a gun could have been located but was not searched.  Plaintiffs' counsel writes that he asked the questions because Plaintiffs argue that no officer on the scene "made anything other than a cursory effort to locate a gun in the vicinity" of the shooting.  [ECF No. 91-1 at 1–2].  Among the areas listed by counsel as possible locations for the gun were in the weeds, under leaves, in nearby recycling bins, under a deck, or on top of the roof of a garage.  *Id.* at 2.  Officer Riffel denied searching any of those areas.  [ECF No. 91-2 at 15].  When asked a similar series of questions, Officer Chiprez insisted that the gun would be visible to the naked eye and an extensive search was not necessary.  *Id*. at 12.

The next day, Major Schaefer was deposed.  Major Schaefer was the first officer, other than Officer Chiprez and Officer Riffel, to arrive on the scene.  He later filed a report of the incident writing, "I asked what had taken place and if there was a gun involved.  Officer Riffel stated he had tackled the individual and the gun was over at another location."  *Id*. at 27.  His report says he told Officer Riffel that "we needed to have someone locate and secure the weapon."  *Id.*

During the deposition, Major Schaefer testified, when Officer Riffel and Officer Chiprez were pointing toward South 7th Street, they were not referring to the location of the gun but instead "they were referring to . . . where the tackling took place."  *Id*. at 21.  It was at this point that counsel asked Major Schaefer if he "had any discussions with anybody about the depositions that occurred in this case yesterday?"  *Id*.  Major Schaefer responded, "not in any great depth, no."  *Id.* Plaintiffs' counsel then asked with whom he had spoken, and Major Schaefer said he had only

spoken to Defendants' counsel about the case prior to the deposition. *Id.* at 22. Defendants' counsel indicated that she did not disclose testimony from the deposition. *Id.*

Counsel then asked Major Schaefer if he wrote that Officer Riffel had told him the gun was over at another location, Major Schaefer acknowledged he did but said that the "particular paragraph was poorly structured." *Id.* Counsel pressed Major Schaefer on this point, and he testified that "upon reviewing that portion of the body camera," Officer Riffel "did not verbally say that the gun was at another location." *Id.* When counsel asked him if he got his report "completely wrong," Major Schaefer responded that he "did not get it completely wrong. The second half of that sentence where it would sound like Officer Riffel had stated that the gun was over there, he did not state verbally that the gun was at another location." *Id.*

Later in the deposition, Plaintiffs' counsel asked Major Schaefer whether the fact that Officer Chiprez and Officer Riffel began their search for the gun by leaving the yard, rather than searching the backyard first, was an "admission that . . . Chiprez just shot and killed a guy that didn't have a gun in his possession; isn't that true?" *Id.* at 25. Major Schaefer responded:

> What it means to me is that I did not see the weapon immediately in the vicinity, therefore we needed to expand our search . . . . We would look in those containers. We would look under leaves. We would look on rooftops. We'd look in trash cans. We'd look underneath cars if there was any. We would look in the alleyway. But that depth of that search for us at that present time was not necessary once that weapon was located in that grassy area I had described to you.

*Id.* After that comment by Major Schaefer, Plaintiffs' counsel reiterated his question whether he had any discussions about the substance of the depositions from the previous day. *Id.* Major Schaefer denied he spoke with anyone other than Defendants' counsel. *Id.* At this point, Plaintiffs' counsel asked Defendants' counsel again whether she shared specific questions with Major

Schaefer, and she said she had "been very careful not to have any substantive conversations with any witness on breaks." *Id.* at 26. Plaintiffs' counsel said he would be surprised if Defendants' counsel had done so but said he found it "more than just coincidence that this officer already knows what questions I'm going to ask about where the gun would be located." *Id*.

Plaintiffs filed this Motion for Sanctions based on Major Schaefer's deposition arguing that he did not provide truthful testimony about how his report was wrong and about how he had no discussions with anyone other than his attorney about the substance of prior depositions taken in the case. Plaintiffs argue that it strains credulity that Major Schaefer was able identify the places where officers should have searched for a gun—the same places Officer Chiprez and Officer Riffel had been asked about a day earlier in depositions—prior to Plaintiffs' counsel asking. According to Plaintiffs, this establishes that Major Schaefer was informed about prior testimony by other officers.

Major Schaefer is an agent of the City and Plaintiffs allege he did not provide truthful testimony regarding his report or with regards to whether he had spoken to anyone about the prior officers' depositions with anyone other than his attorney. Plaintiffs ask the Court to sanction the City. Plaintiffs suggested in their brief that the appropriate sanction in this instance is the Court should bar Major Schaefer from testifying that his report was wrong or incorrect. During oral arguments on January 13, 2021, Plaintiffs' counsel indicated that instead of limiting Major Schaefer's testimony, perhaps they would just like a jury instruction explaining the situation between Major Schaefer and the other deposed officers.

The Court finds that entering an order limiting Major Schaefer's testimony, as Plaintiffs' counsel seemed to acknowledge during oral argument, is excessive and premature based upon the currently known facts. Instead, Plaintiffs may cross-examine Major Schaefer on this issue before

the jury and allow them to weigh his credibility.  Plaintiffs may also question Officer Chiprez and Officer Riffel about whether they spoke to Major Schaefer after their depositions about the questions that were posed to them by Plaintiffs' counsel during the depositions.  The jury can then consider all the facts and circumstances of Major Schaefer's testimony in deciding whether to believe him, and what weight they give his testimony—a core function of the jury.  Further, these events are on video.  The jury will likely be able to view the interaction and decide for themselves whether Officer Riffel was telling Major Schaefer that the gun was in another location.  The Court has already decided that there are material facts precluding summary judgment, this fact being one of them.  If Plaintiffs wish to press Major Schaefer on any discrepancies in his report and his testimony, they may do so at trial.  Plaintiffs' Motion for Sanctions is DENIED.

## III.    CONCLUSION

For the reasons state above, Plaintiffs' Motion for Partial Summary Judgment, [ECF No. 90], is GRANTED in part and DENIED in part.  Plaintiffs' Motion for Sanctions, [ECF No. 91], is DENIED.  Defendants' Motion for Summary Judgment, [ECF No. 92], is GRANTED in part and DENIED in part.  The following claims shall proceed to trial against each Defendant:

- The City: Count I and Count III (under the Iowa Constitution); Count VI

- Officer Chiprez: Count I and Count III (under the U.S. and Iowa Constitutions); Count VI

    IT IS SO ORDERED.

Dated this 29th day of January, 2021.

_Stephanie M. Rose_
_____
STEPHANIE M. ROSE, JUDGE
UNITED STATES DISTRICT COURT